FREDERICK DIENER, Complainant, Appellee,

*vs.*

CHARLES SCHLEY, Defendant, Appellant, impleaded with FREDERICK DIENER, JR., and CALEB WALL.

APPEAL IN EQUITY FROM WALWORTH CIRCUIT COURT.

Parol evidence of the contents of a letter written by a party in this country to a person in Germany, who had always lived there, cannot be received in evidence without proof of its loss.

A witness was allowed to testify to the contents of a letter which he swore he had seen in Germany, and which had been written by the defendant to his mother residing in Germany. Held, that the evidence was improperly admitted. The proper foundation for the introduction of secondary evidence should be laid.

The intention of the grantor in a deed is not, as a general thing, immaterial to the inquiry as to which of two persons of the same name as that of the grantee named in the deed, should take the title thereby conveyed.

In case where the deed is so drawn as to be sufficient to pass the title to either the father or the son, both being of the same name, the title passed according to the intention of the parties.

If in such case, the grantor is entirely indifferent, but subject to the control of the person with whom he negotiates, and who pays the purchase money, the will of the latter ought to control, and the title to pass according to his intention.

An interpreter is not *necessarily* an agent of the parties, so that what he says may be given in evidence, if the party sought to be charged by his declarations had no knowledge of the language in which they were made, unless accompanied by proof that the interpreter correctly interpreted the language of the party.

A party *may* make an interpreter his agent, but the mere fact of his contracting with another party whose language he does not understand, through an interpreter, does not constitute the latter an agent so as to bind him by a false translation.

THE bill was filed originally against Frederick Diener, jr.; sole defendant, to procure the release from him of certain claims of title set up by the latter, to certain lands in the bill described. The bill is concise, and cannot well be abbreviated, and is as follows:

" Your orator, Frederick Diener, whose place of abode is in the town of Spring Prairie, in the county of Walworth, com-

plaining, shows, that on the 13th day of October, A. D. 1851, he
purchased of one John Martin, and Philomela, his wife, in con-
sideration of $3,000, all those certain pieces or parcels of land
situated in the county of Walworth aforesaid, and described as
follows, to wit: The southwest quarter of section No. twenty-
four (24), in township No. three (3), north of range No. eighteen
(18) east, containing 160 acres of land, be the same more or less;
also, that part of the northwest quarter of said section No.
twenty-four (24), bounded as follows: commencing at the quar-
ter-section post, between sections No. twenty-three and No.
twenty-four (23 and 24), run thence north sixteen chains and
twenty-four links (16.24), thence east across the northwest quar-
ter of said section No. twenty-four (24), then south sixteen (16)
chains and twenty-four (24) links, to the centre of said section
No. twenty-four (24), and thence west to the place of beginning,
containing sixty-four 96-100 acres of land, more or less, reserv-
ing in common the burying ground then on said premises. The
north and south road, on the eighty rod line, being for the use
of your orator and the said grantors, in common.

And your orator further states, that the whole consideration
for said premises was paid by your orator, And your ora-
tor further states, that at the time of purchasing said lands
above described, Carl Diener, a son of your orator, of the age of
sixteen years, resided in Germany, where he was serving an ap-
prenticeship to the trade and business of a miller, which appren-
ticeship was to terminate in two years from that time. And
your orator being anxious to make some provision for his said
son, Carl Diener, in view of his tender age, and his residing at
so great a distance from your orator, in case of the death of your
orator, took the deed of the above described premises from the
said John and Philomela Martin, running to and in the name of
your orator and the said Carl Diener, jointly, as grantees therein,
which said deed was duly executed and acknowledged by the
said John and Philomela Martin, on the 13th day of October,
1851, and was duly attested, and was, on the same day at 12
o'clock, M., recorded in the register's office of said county of
Walworth, in volume 13 of deeds, on pages 479 and 480, as by

said deed, or the record thereof, ready to be produced as this court shall direct, will more fully appear.

And your orator further states, that he now has the possession and legal title of an undivided half of all and singular the above described premises. And your orator further states, that Frederick Diener, jr., the defendant in this suit, who is a son of your orator, sets up a claim to your orator's said undivided half of said premises, and falsely and fraudulently pretends and claims that he is the person named in said deed as one of the grantees of said lands and premises, and not your orator, and that he, and not your orator, is the legal owner of the said undivided half of said lands.

Your orator, therefore, asks the aid of this court in the premises, and that the above-named defendant, Frederick Diener, jr., may appear before this court, and true, direct and perfect answer make, without oath (his answer upon oath being hereby waived), to all and singular the matters and things hereinbefore stated and charged, as fully and particularly as if the same were here again repeated, and he thereto distinctly interrogated paragraph by paragraph. And that the said defendant, Frederick Diener, jr., may be decreed to release to your orator all claim to the said undivided half of the said lands and premises, and to pay to your orator his costs in this behalf expended, and that your orator may have such further or other relief as shall be agreeable to equity and good conscience.

Prayer for process, &c.

The defendant Frederick Diener, jr., answered, setting forth that he and the said Carl Diener, mentioned in the bill of complaint, are sons of the complainant, and " that he, the said complainant, having derived a large amount of money from the mother of this defendant and the said Carl, and intending to secure a portion thereof to this defendant and his brother Carl, the said premises were purchased at the time and for the consideration in said bill of complaint mentioned, for this defendant and the said Carl, and the conveyance from the said Martin and wife was made and executed to vest this defendant and the said Carl with the title of said premises therein described, and

not the said complainant and the said Carl, as in said bill untruly stated.

And this defendant further shows, that he is one of the grantors named in said deed, and was the real and true person referred to and described, or intended so to be by the said deed, and not the said complainant, and that such conveyance was. intended as well for the benefit of this defendant as the said Carl, as in equity it might well be, and that after the making of said deed, the same was delivered to this defendant and the said Carl with the full knowledge and free consent of the said complainant at the time, and that for a long period afterward the said complainant yielded his full assent thereto, in no wise claiming or pretending that the title to said premises was, or was intended to be, vested in the said complainant, but in this defendant and the said Carl, and so continued to assent to the title of this defendant until an unexpected and unfortunate estrangement between this defendant and his said father, when the said complainant, contrary to good faith and the true intent and meaning of said deed, designing to oppress this defendant, denied the title aforesaid of this defendant, and claimed to be seized of the said premises, which said claim, and all right or title, either in law or equity, of the said complainant, in his said bill set forth, this defendant expressly denies.

And this defendant denies all unlawful combination, &c.

May 30, 1853, the complainant, by leave of the court, filed a supplemental bill, making Charles Schley and Caleb Wall defendants, charging that they had become purchasers from the defendant Frederick Diener, jr., of his interest in the property in question since the filing of the original bill.

To this the defendant Schley filed his separate answer, August 24, 1853, as follows:

This defendant, &c., answers and says, that he admits that on or about the second day of October, 1852, this defendant and the said Caleb Wall purchased and took a conveyance from the said Frederick Diener, jr., in the said bill named, of all his right, title and interest, legal and equitable, in and to the lands and

premises in said bill described, to wit: all the undivided one-half of those certain pieces or parcels of land situated in the county of Walworth aforesaid, and described, &c. ; and that this defendant and the said Caleb Wall did, from that time until about the fourth day of November, 1852, claim and pretend that by virtue of said purchase and conveyance, and as assignees of the said Frederick Diener, jr., for a valuable consideration they, this defendant and the said Caleb Wall, became and were the legal and equitable owners of the undivided one-half of the said lands and premises above described, and in and by said bill claimed to be the property of the said complainant.

And this defendant further answering, saith, that prior to the filing of said bill of complaint against this defendant and the said Caleb Wall, and before the service of subpœna upon them or either of them, to wit: on or about the 4th day of November, 1852, the said Caleb Wall sold and conveyed by deed to this defendant all the right, title and interest of him, the said Wall, in and to the said lands and premises, and that this defendant is the sole owner thereof, and of all the said undivided one-half of the said premises above described.

And this defendant utterly denies all fraud or unlawful combination and confederacy in the said bill charged, without that any other matter or thing material or necessary for this defendant to make answer unto, and not herein or hereby well or sufficiently answered unto, confessed or avoided, traversed or denied, is true to the knowledge or belief of this defendant.

All which matters and things this defendant stands ready to aver, maintain and prove, as this honorable court shall direct, and humbly prays to be hence dismissed with his reasonable costs and charges, in that behalf most wrongfully sustained.

The separate answer of Caleb Wall was filed August 27, 1853, and is in substance the same with the answer of Charles Schley above given.

The complainant filed general replications, and the cause was referred to Wm. C. Norton, as a special commissioner, to take testimony therein.

The testimony taken before the commissioner was very voluminous, and many objections taken thereto, upon the hearing of which read, together with the exhibits produced, the court ordered that a feigned issue be framed and submitted to a jury, "to inquire and determine whether the legal title to the lands described in the deed, mentioned and described in the pleadings in this cause, bearing date the 13th day of October, A. D. 1851, purporting to be executed by John Martin, and Philomela, his wife, to Frederick Diener and Carl Diener, was, at the time of the commencement of this suit, to wit: on the 14th day of September, A. D. 1852, in the said complainant, and the said Carl Diener, and was then had and held by them," and " that, on the trial of the said feigned issue either party may read in evidence any deposition of any witness taken on either side, before Wm. C. Norton, Esq., a special commissioner appointed for that purpose in said cause, subject, however, to any objections to any of the testimony contained in said depositions, when due objection thereto was made before said commissioner, or may examine said witnesses on the said trial, and may introduce any further or other testimony on said trial, which either of them may deem proper, and which is pertinent to the issue, &c."

The following is the substance of the testimony and evidence produced on the trial of the feigned issue, with the objections and exceptions made and taken on the trial.

The complainant offered in evidence a deed, as follows:

" This indenture, made the thirteenth day of October, in the year of our Lord one thousand eight hundred and fifty-one, between John Martin, and Philomela, his wife, of Spring Prairie, county of Walworth, and state of Wisconsin, of the first part, and Frederick Diener, of the same place, and Carl Diener, of Germany, parties of the second part, witnesseth, &c."

(This deed conveys the premises described in the bill of complaint, being the premises in dispute, with full covenants, and is duly signed and acknowledged, and witnessed by A. Bade and David George.)

The complainant produced the deposition of Lyman Cowdrey, taken before the commissioner, Wm. C. Norton, by which it ap-

peared that Frederick Diener, sr., paid to John Martin, the vendor of the premises in dispute, the consideration money for the purchase of the premises, amounting to over $2,000, at Elkhorn, in Walworth county, in October, 1851; that Martin, Bade, David, George and witness, were present when the money was paid, and a deed of the premises delivered; that the deed was taken to the register's office for record, and that neither Frederick Diener, jr., nor Carl Diener, was present; and that Bade appeared to be acting as agent of the complainant and Martin.

The complainant called also Johnson Gates, who testified that he had known the Dieners since 1851, both living on the Martin farm.    The witness worked for the complainant from a week or two after he moved on to the Martin farm, which was in the fall of 1851, until the fore part of July ensuing, most of the time off and on.    "I worked on the John Martin farm most of the time; the old man Diener seemed to have control of the farm during the time that I resided in the neighborhood; complainant occupied the farm at that time; Frederick Diener, jr., was there most of the time, and until he left, the winter following, he appeared to act in the capacity of a hired man, and told me that he had $10 or $10½ a month, as near as I could understand him; he talked very broken English; he told me this in the fore part of the winter; he appeared to be under the control of complainant during the whole time we were both there; I think I never saw Frederick Diener, jr., there but once after he left, and then he came after his clothes; that was a few weeks after he left; I have never seen him about the premises since; I have been to Diener's several times since last January, and complainant still occupied.

"I know Carl Diener, son of defendant; he came there next summer, to complainant's, about the first of May, A. D. 1852; he came there and worked for complainant; he has lived there from that time to this; the old man Diener (complainant) has seemed to have control of the place since Carl Diener came there, the same as before; the defendant, Frederick Diener, jr., told me he was twenty-four years old in the fall of 1851; defendant

lived on the place all the time until he.left in the winter or spring of 1852 ; complainant assumed the direction of all matters concerning the farm; the defendant was a single man at the time he lived there, or appeared to be,.and complainant seemed to be in a married state, had a woman they called his wife ; Frederick Diener, jr., asked me how much working men could get a month in this country; I told him that Germans got $15 or $12 a month, after they had learned the ways of this country. I then asked him how he worked, and he said his father gave him $10 or $10.50 per month; I never saw complainant pay him anything for work; Carl Diener, I think, is about sixteen years old."

William Baumbach, on the part of complainant, being sworn, complainant's counsel shows to witness a book marked exhibit B. Witness says he has compared it with a paper marked exhibit C, and that exhibit C contains a literal translation of the contents of exhibit B. Complainant's counsel then gives exhibit B and C in evidence. Defendant's counsel objects to their admission. Witness further says, exhibit B is in the German language, and he is acquainted with both German and English.

*Exhibit C, Translation of Exhibit B.*

Account of the wages of my son, Frederick Diener. Receives the same for his wages from October 15th 1851.

| | | |
|---|---|---|
| The first three months at | $7 00 | $21 00 |
| " next three months, | 6 00 | 18 00 |
| " again, next three months, | 11 00 | 33 00 |
| " last following three months, | 13 00 | 39 00 |
| | | $111 00 |

On the part of complainant, Andrew Betzig, being sworn (through a sworn interpreter, William Baumbach), said : " I am acquainted with Frederick Diener, jr., and the complainant; have been so acquainted since my childhood; have been intimately acquainted for the last eight years; I am the brother-in-law of complainant; I believe the complainant and his son, Frederick Diener, jr., emigrated to this country in the year

1851; I came with them; when they started from Germany, I don't know whether Frederick Diener, jr., had any money or not on the way here; I saw him have $25; Frederick Diener's father paid for the son's outfit and clothing, and fare to this country; Frederick Diener, jr., is now about twenty-six years of age (admitted that Frederick Diener, jr., had no means of his own at the time he came to this country; admitted that the complainant was worth about eight thousand dollars when he left Germany, and brought that amount with him when he came to this country); I was present in Milwaukee during negotiations for the purchase of the Diener farm (said farm being the one in dispute in this suit); the terms of the purchase were agreed upon there (meaning Milwaukee); I was with the complainant all of the time during the said negotiations for the said farm; Frederick Diener, jr., was present also at that time; I think the bargain was made in the fall of 1851; I think it was in the early part of October in that year; it was two or three weeks previous to the time of complainant's taking possession of said farm; Frederick Diener, jr., took no part in the negotiations for the purchase of said farm, in my presence; I was sitting with Frederick Diener, jr., during the negotiations, in the same room. (The foregoing, respecting negotiations, was duly objected to.) Frederick Diener, jr., at this time, was in the employ of the complainant, at a yearly salary; when the complainant took possession of the farm, I was living with him, and remained with him nearly a year; I think Frederick Diener, jr., lived with the complainant about three months after he took posssession of the farm; the complainant controlled and carried on the farm; Frederick Diener, jr., seemed to have no control over it, and made no claim to any interest on it to my knowledge.

" The signatures to the memorandum, in the book heretofore offered in evidence, were made by Frederick Diener, jr., in my presence.

" Complainant had three children when he left Germany, Frederick, jr., the oldest, Carl, and one daughter, now in Germany.

" The terms of the purchase, of which I have spoken, were $3,000 for 226 acres; the negotiations continued about one hour;

this was the only time when I was present during any negotiations in regard to said farm; the complainant did not speak English during the negotiations; he could not; Mr. Bade acted as interpreter; the complainant told me that Mr. Bade, of Milwaukee, acted as his friend and adviser, and also Captain George, of Spring Prairie."

*Question.*—" State the substance of a conversation, in relation to said farm (if you heard any), between complainant and Frederick, jr., previous to the time Frederick left the complainant?" (Objected to.)

" The complainant came home from Burlington, the night before Frederick, jr., left the farm, and said that he had found out in Burlington, that the deed of the farm was not executed in the manner he wanted to have it done, and believed he was deceived in regard to it; Frederick, jr., was present when he said this; the following morning, at the breakfast table, he made the same remarks that he did the night before, on account of the deed, and I noticed that Frederick, jr., who sat by my side at the table, trembled so that he could hardly hold his fork; soon after that he got up, lit his pipe, and went away, and has never returned; Frederick Diener, jr., said nothing, looked pale and seemed sick; the complainant, at he time they sat at the table, said he thought that the name of his son, Frederick, jr., was inserted in the deed instead of his own; he said he found this out in Burlington, the evening before; the complainant said he did not think such a cheating operation could take place. The paper now shown to me, marked Exhibit D, is in the handwriting of Frederick Diener, jr.; I know his handwriting."

William Baumbach, on the part of the complainant, testified " That the paper attached to exhibit D, translated exhibit E, is a correct translation of said exhibit D. I saw Frederick, jr., in Racine, and had a conversation with him in regard to difficulties with complainant about the Diener farm; during the conversation, I asked him if he had any just claim to said farm, which he did not seem to understand; I then asked him whether the farm was standing in his name or his father's, and he said he did not know; he said that he had taken the course he had in re-

gard to the farm for the purpose of keeping his mother from getting it away from his father; this was in the latter part of the winter in 1852 and 1853."

All the evidence in regard to conversation is objected to.

On the part of the complainant, Frederick Keuper testified: " I am acquainted with the two Dieners, parties in this suit; in a conversation which I had with Frederick Diener, jr., he admitted that the farm was bought by the complainant, and with his own money, but said the deed was made out in his (Frederick, jr.'s) name, and he meant to hold it.

" The complainant has always had the possession and control of the farm, and still has it."

Complainant then offered in evidence exhibit D, with its translation E :

### " Exhibit E, Translation.

" My dear Father :—The estate of my mind did not permit me to explain myself verbally to you, dear father. It is my desire, dear father, as long your eyes are open as well as afterwards to take care for you, as it is the duty of a child to take care for the father. O what miserable (mean) slanderers have ventured to separate, in such an impudent manner, a father from the child. Might go such people to the devil and hell, do not know, what they else should be worth. It is my intention to make my living by good farmers and to do to you, my dear father, what I am able in my powers; so help me God for ever and ever. Might assist the sacred Being, that the abominable trade of those wretched slanderers might be cut off. Therefore, be so kind and send by the bearer my things, as well as you will hand to him my due wages, $8 and 5s, and let you give receipt for it, of that sum; you have to deduct a debt for received stockings from your dear wife. For the chest, which I received of you last night, I tender to you my kindest thanks. Might keep you this land in everlasting health which wishes always your true son,

(Signed) " FREDERICK.

" Spring Prairie, February 2, 1852.

" That one hundred dollars I owe you for expenses for me, according to note, I will pay you after due time. F."

Charles Diener, on the part of complainant, testified: "I am a son of the complainant, and brother of Frederick, jr., defendant; (admitted by the defendant that for three years prior to complainant and defendant's coming to this country, Frederick, jr., was not in the employ of his father, and that the son of complainant (Frederick) usually signs his name Frederick Diener, jr., and that soon after the conversation aforesaid with Doctor Baumbach, Frederick, jr., left this part of the country). Witness says that he has heard nothing from Frederick since he left, and his friends do not know where he is. I live with the complainant—have lived with him since May 2, 1852. My father got the money which he brought to this country from the sale of his farm. The farm was no part of my mother's estate. My mother had a farm aside from that.

"I saw a letter written by Frederick, jr., to my mother in Germany; this was before I came to this country, and after the complainant and Frederick came to this country; the last I saw of said letter, my mother had it in the house in Germany; my mother now lives in Germany; she has not been to this country since that time; my father and mother have not lived together as husband and wife for more than eight years; I know the contents of the aforesaid letter; it was written and signed by Frederick Diener, junior, in America; I knew his handwriting."

*Question.*—"State the contents of that letter?"

Defendant objects to proof of contents of letter by witness, and also to the contents themselves, as evidence.

*Answer.*—"It stated, in substance, that he (Frederick, jr.) gave the interpreter, privately, $10 for to make the deed in the names of myself and my brother, Frederick, jr., and, also, that if his father should find it out, he (Frederick, jr.) had made an arrangement to go and live with Captain George; I cannot state the contents of the letter word for word."

*Cross-examination.*—"It has been about one year and half since I saw the letter; I was about 15 years old when I last saw it; when my father and mother ceased to live together as husband and wife, I was about eight years old; my information, in rela-

tion to the farm I spoke of as being my father's, in Germany, came from my father and from no other source; I cannot swear, in fact, that the farm did not come originally from my mother; my mother does not possess a very large property; about two thousand dollars more than my father; the money which my father brought to this country came by the sale of said farm; my mother supports my sister in Germany; my father and mother lived in Auhal Keaten; it is under the king of Prussia and is a duchy.

John Martin, called by the defendants, testified: "I know Frederick Diener, complainant, and his son, Frederick Diener, jr.; I first knew them in the fall of 1851; I had engaged Powers & Schley, of Milwaukee, to sell the farm now occupied by the complainant, which I then owned; I lived on said farm at that time. The complainant came to my house with Mr. Bade, for the purpose of looking at my farm, in the latter part of September of the said year 1851; I bargained with complainant for a sale of the farm, through Mr. Bade, as his interpreter, in the month of October, between the 10th and 15th, 1851, at my house: I mean the farm now occupied by the complainant, and situated in the town of Spring Prairie, Walworth County. On Monday, I think, the 13th of October, of said year, I signed a deed of the farm; Mr. Bade drew the deed."

The complainant here objects to the showing, by the witness, the contents of any deed, or any statements made by Mr. Bade or any other third person. .

"I signed one deed presented to me by Mr. Bade; he was the agent of myself and the complainant, as I supposed; Mr. Bade spoke for complainant throughout all of the negotiation; I executed the deed presented to me by Mr. Bade and gave it to him; he left the room and was gone about half an hour, and then returned and requested me to take back that deed and execute another, because he (Bade) said the complainant wished it to be conveyed to his sons; the first deed was then taken and put into the stove in my presence and burnt up; Mr. Bade put it in stove; at the time the first deed was executed, I had not received the consideration for the farm; the first deed was to com-

plainant alone; another deed was then made to the sons, immediately after the burning of first deed; I was in my room unwell; the second deed was drawn in my presence by Mr. Bade; some one else was present; don't recollect who; the deed was duly executed by myself and wife, and handed it to Mr. Bade, and Mr. Bade, complainant, Captain George and myself got into a carriage and went to Elkhorn. (The deed referred to is the same one offered in evidence, and marked Exhibit A. This is admitted by the complainant.) The deed, as executed by me, was intended to be executed to the sons of complainant. The Frederick Diener named as grantee in the deed, was the son of complainant. The deed was delivered and the money paid at Elkhorn; Mr. Bade paid me the money for the complainant; Captain George was with us; he had been sent for by complainant and went at his request. (Complainant here objects to showing by the witness anything which Captain George said or done, for the purpose of establishing his agency, or for any purpose.) Captain George left this country early last spring; I don't know where he is; Captain George also interpreted between. He appeared to be the confidential friend and adviser of the complainant, and he represented him and claimed to speak for him; Mr. Bade was my agent, that is Powers & Schley were my agents, and they sent him there as interpreter, which was actually necessary to transact business with Mr. Diener (complainant); Mr. Bade, Diener, George and I returned together; on our return, about four miles from Elkhorn, Mr. Bade and Diener were in earnest conversation with each other, they both turned around and Bade said there was a mistake in the deed, that the word junior was left off of Frederick's name; Bade explained to me that the old man's name was Frederick Diener, and the young man's name was Frederick Diener, jr., complainant at the same time said (putting his hand to his breast), son, son, son; a consultation was then held, and it was concluded the best way would be to get some one to go there and alter it; this conclusion was communicated to complainant, and he appeared to be satisfied; after we got home a conversation was held between Mr. Bade, complainant, Captain George and Mr. Cole, of Burlington, in relation to Cole's going

to Elkhorn and making the required alteration in the deed; complainant wished him to go and make the alteration, as far as having the jr., added to the name of Frederick Diener." Witness shown paper, marked Exhibit F, dated October 14th, 1851, purporting to be signed by John Martin, Frederick Diener and Frederick Diener, jr.: witness says: "they were signed in my presence, and are the signatures of the complainant, defendant and himself, meaning witness; Albert G. Cole wrote the agreement aforesaid at my house, on said farm, and it was signed there, according to the best of my recollection. Frederick Diener signed the agreement, representing his son in Germany. Frederick, junior, was at my house when we returned from Elkhorn.

*Cross-examined.*—" The deed was delivered to Bade at my house; that was the last I saw of it until four or five weeks ago. I saw Frederick Diener and Frederick Diener, jr., after I had signed article of agreement, marked exhibit F, write upon it; I cannot say what they wrote; Captain George acted as interpreter at that time; I did not understand anything that Mr. Diener said; all that I could understand from him was by signs; he could not speak a word of English as far as I know; it was from the interpreter alone that I understood the intentions and wishes of Mr. Diener; I had no other means of knowledge. It is my opinion that at that time Mr. Diener could not speak or read the English language. I have not, to my knowledge, in a letter to Albert G. Cole, or otherwise, stated in substance or to the effect that the deed was different from what the complainant intended it to be, or that he was likely to find himself cheated. It is my opinion that I have never made such a statement. The terms of the purchase had been agreed upon before complainant came out to execute the deed. Complainant took possession immediately after the deed was executed. Schley, the defendant, is one of the firm spoken of as Powers & Schley in my direct examination. There has been difficulty between myself and complainant, and there is still difficulty about it, on account of his occupying reserved rights, and ordering me off from the reserved rights. I have never, to my knowledge, threatened or

stated in presence of F. Keuper, or any other person, in sub-
stance, or to the effect, that I would use advantages to injure
the complainant, or in any manner injure or assist to injure
him.

"I have never written to complainant, to my knowledge. I
think I should have remembered it if I had. On the subject of
his interests here I mean."

*Direct resumed—Recalled by the defendant.*—"The instrument,
marked exhibit F, was written out in full, as it now appears,
except the signatures, before I signed it.

"Mr. Bade carried the deed with him to Elkhorn. I moved
off the place a day or two after complainant moved on.

"The reserved rights of which I spoke, were: the use of a
burial ground, and the use of a road across the place. They
were reserved in the deed, from me, of the farm, heretofore ex-
hibited.

"When I say, to my knowledge, I mean to the best of my
recollection."

Albert Bade, called by defendants, testified: "I reside in the
city of Milwaukee; I am a native of Holland; I have lived in this
country about ten years; I am familiar with German, Dutch and
English languages, can speak and write them. I am clerk of
the board of supervisors of Milwaukee county; in the month of
October, 1851, I was in the employ of Powers & Schley, of Mil-
waukee; I am acquainted with Frederick Diener and Frederick
Diener, jr.; they are from Germany; I became acquainted with
them in the fall of 1851, in the city of Milwaukee, through ne-
gotiations for the purchase of a farm. Through my agency, as
clerk of Powers & Schley, they made a purchase of John Mar-
tin, of Spring Prairie, Walworth county, the farm then occupied
by him and now by complainant; I was present when the sale
of said farm was consummated; it was done through my agency.
The deed was executed upon the farm some time in the month
of October, 1851; think it was before the middle of said month;
I acted as notary public in acknowledging the deed, &c. I drew
a deed in the city of Milwaukee before I came out with com-
plainant and his family; this was executed by John Martin and

his wife, and afterwards destroyed; before it was destroyed, I went out doors, and went where complainant and Captain George and Frederick, jr., were standing talking to one another; I told them there, that the deed was executed, and that John Martin was ready to go to Elkhorn to have it recorded; then complainant, Captain George and Frederick, jr., began to talk to me, stating that they had come to the conclusion to make another deed, in the name of his sons, Frederick and Charles, and that complainant would give his (then) wife $1,200 or $2,000 which he had in Buffalo or New York city. The complainant stated this in presence of the others; he said that the money which he brought with him, came out of the estate of his first wife, which was allowed him by the court in a divorce suit with her; he did not seem to be on friendly terms with his present wife; the wife from which he was divorced was the mother of Frederick, jr., and Charles Diener, complainant said.

"Complainant then instructed me to draw another deed in the names of his sons, Frederick and Charles Diener. The old deed was not satisfactory on account of its being drawn to Frederick Diener. I went in and told John Martin, and he consented to execute another; and the old deed was destroyed in presence of John Martin and his wife. I then drew another one, in John Martin's room. I followed the directions of complainant in drawing the deed. I am now shown an instrument, marked exhibit A, purporting to be a deed, from John Martin and his wife to Frederick Diener and Charles Diener, dated October 13, 1851. This is the second deed drawn by me, as aforesaid, and was executed in my presence, and I took the acknowledgment of it, as notary public. Frederick Diener, jr., son of complainant, was present at the time, on the farm. Complainant said to me, you had better draw the deed to my sons, Frederick and Carl."

*Question.*—"Was the Frederick Diener, named in the deed shown to you, marked exhibit A, as one of the grantees therein, intended at the time for the complainant, Frederick Diener, or for his son Frederick?"

To which complainant objects.

*Answer.*—"At that time it was complainant's intention to

draw the deed in the sons', Frederick and Carl Diener, names; I drew the deed to Frederick and Carl Diener."

*Question.*—"To which of the two Frederick Dieners did you draw the deed?"

Objected to by complainant.

*Answer.*—"To Frederick Diener, the son, according to complainant's directions; there was nothing said to me about having the deed drawn to complainant and his son Carl, by complainant, at that time; nothing was said to me by complainant about an intention that he (complainant) should have the farm while he lived, and his sons after his death; I thought he did not take me into his private confidence at that time; in mentioning his son, Frederick, complainant did not call him Frederick, jr., according to my recollection. After this deed was executed, we went to Elkhorn; Captain George, John Martin, complainant and myself went to Elkhorn; at Elkhorn the deed was handed to the register, to be recorded, and complainant gave me the money to pay to John Martin; I paid Martin three thousand dollars ($3,000). We then started for home; on the way home complainant, Captain George and myself got to talking about the matter; either Captain George or the complainant, don't recollect which, asked me if the word junior was after Frederick's name, in the deed; I told them no; complainant then commenced talking with Captain George; complainant did not seem to like it that the junior was not attached to Frederick's name; then they talked to me about it, and wanted to know what was to be done; I told them I couldn't say, if they wanted anything done, they must talk to Mr. Cole."

*Question.*—"Did you hear the complainant say, on the way home, how he intended to have the deed drawn or executed?"

To which complainant objects.

*Answer.*—"I did not attend particularly to the conversation with complainant, on the way home. I heard complainant say to Mr. Martin, my sons, pointing to himself, or something of that kind. I returned from Elkhorn to Martin's place. Captain George acted in these transactions as complainant's friend. Captain George and myself both acted as interpreters for the com-

plainant during the transactions. Towards the last of these transactions Captain George acted more than I did as interpreter for complainant."

*Cross-examination.*—" The Schley to which I refer, the defendant here, was one of the firm of Powers & Schley, for whom I acted as agent. At the time the rupture took place between the complainant and his son, I was a clerk for Schley, according to my best recollection, and had been from the latter part of 1850, or fore part of 1851. I did not understand the conversation between Captain George and complainant, on the way home, of which I have spoken, my attention being otherwise directed. I came out with John Lace, under the directions of Schley and Wall, the defendants, to make a settlement with Diener, if I could—if not, to leave the business to John Lace and the deputy sheriff of Elkhorn and Lyman Cowdrey. John Lace got possession of some twenty-five head of cattle and two horses from Mr. Diener's farm, or the one occupied by him, according to the best of my knowledge. On the morning after he (Lace) took possession of the property, we started for Milwaukee with it, and the deputy sheriff went home. This was after Frederick, jr., left his father's, and about a week before Lace was shot. (All the above testimony relating to the removal of personal property was objected to.) The deed, exhibit A, was drawn as directed by complainant, and was accepted by him. I did not read it to him, but explained to him the material parts of it. The deed was handed over to the register by him, or by his directions. I don't recollect whether I was present or not at the sale, from Frederick Diener, jr., to Schley and Wall. From what I saw of the transactions, I believe that the complainant understood well what he was about at that time. During the time the deed was executed, and when we came back from Elkhorn, complainant, I believe, understood well what he was about all of the time during the whole of the transactions in relation to the farms, and I have never, since the execution of the deed, changed my belief in regard to that."

*Question.*—" Have you ever stated in presence of, or to the complainant, in substance, that the deed was drawn in the name

of the old man and the son, that it was intended to be in the name of the complainant?"

*Answer.*—" I don't recollect."

*Question.*—" If you had so stated, would you be likely to recollect it?"

*Answer.*—" I don't know."

*Question.*—"What do you think about it?'

*Answer.*—" I have got no opinion about it."

*Question.*—"Have you stated to complainant, or in his presence, in substance, that Frederick, jr., had nothing to do with the farm?"

*Answer.*—" I don't recollect that I have."

*Question.*—" If you had so stated, would you have recollected it?"

*Answer.*—" I do not know."

*Question.*—" Have you ever stated in writing, or otherwise, in substance, or to the effect, that the deed was drawn in the name of the complainant and his minor son?"

To which question the defendant objects.

*Answer.*—" I don't recollect whether I have or not."

*Question.*—" If that had been the case, would you be likely to recollect it?"

*Answer.*—" It is more than I can tell."

*Question.*—" Have you stated in presence of Frederick Keuper, in substance, that the deed was drawn in the name of the old man and Carl, that it was not intended to be in the name of Frederick, jr., or that Frederick, jr., had nothing whatever to do with the farm?"

*Answer.*—" To the best of my impression I have not."

*Question.*—" Did you state to A. G. Cole, while on your way to Vienna, or while with him in a carriage, or at any other time, in substance, that the complainant's real intention was to arrange that he could control the farm or property while he lived, and that it should go to his children after his death?"

*Answer.*—" To the best of my impression I did not."

*Question.*—" Did you, in a conversation with Henry Martensen upon the subject matter of Frederick, jr.'s, claims to the property

in dispute here, or in reference to said deed or farm, state, in substance, that if the old man, Diener, had not made you mad, it would have been different with him ?"

To which question defendant objects.

*Answer*—" To the best of my impression I did not."

*Question.*—" While speaking or writing upon the subject of the drawing and execution of the deed aforesaid, have you stated orally, in presence of Frederick Keuper, or in writing, or otherwise, in substance, that the complainant did not know what he was about ?"

To which question defendant objects.

*Answer.*—" To the best of my impression I have not."

*Question.*—" Are you a man of ordinary good memory ?"

*Answer.*—" I think I am. I recollect of sending a letter to Mr. Barnes by the old man Diener, or Keuper, at the request of Mr. Barnes and the old man Diener; I wrote it and sent it from Milwaukee.

All the above in regard to the letter defendant objected to.

*Direct resumed—Question.*—" What is your best impression about having made such statements mentioned and referred to in the questions above, to which you have answered, you did not recollect ?"

*Answer.*—" My best impression is, I did not make such statements."

William Riel, called by defendant and sworn, deposes and says: " I live in the town of Burlington; have lived in the neighborhood about five years; I know Frederick Diener, the complainant in this suit; have known him ever since he lived in Walworth county; I know Frederick Diener, jr., one of the defendants in this suit; some time the first winter he was here I had a conversation with the complainant; it was before Frederick, jr., left his father's; I am a German, and speak the German language; on complainant's farm, in Walworth county, I was there, and complainant showed me the whole farm, and he (complainant) told me he had bought the farm for his two boys, Frederick and Charley; Frederick was there, and he said he expected Charley from Germany; complainant said some

friends told him to have a deed this way, for, when the old man (complainant) died, it would save the trouble of making a new deed.

" Complainant told me that he intended his sons to have it after he was dead ; I understood from the whole conversation that complainant was to have the farm while he lived, and the sons when he died ; this was complainant's intention, as I understood it ; I think Frederick Keuper was present ; this conversation took place a little behind the cattle yard.

" Frederick Diener, jr., was not there ; I understood this intention from complainant himself; Frederick, jr., was not there during the conversation."

Albert G. Cole, on the part of defendant, being duly sworn, deposes and says : " I reside in Burlington ; have been here about seven years ; I know the complainant in this suit, and I know Frederick, jr., also, the defendant ; I know John Martin ; I recollect the sale of the farm on which John Martin lived in 1851 ; I was not present at the sale ; I knew of the sale the next morning after it took place ; I went to John Martin's place, on Spring Prairie, and the parties had gone to Elkhorn, as I was informed ; I mean complainant, John Martin, Mr. Bade, and, I think, Captain George ; Mr. Martin was then living on the place ; I was there when they returned from Elkhorn (I mean the men aforesaid) ; I went there at the request of John Martin, and assisted in the sale of the personal property that was sold upon the occasion, from Martin to Dieners; through Captain George and Mr. Bade, as interpreters, I had some conversation with complainant in reference to the deed, which had been executed, of the farm ; from appearances I supposed that Captain George and Mr. Bade were acting as agents, interpreters and friends of the complainant."

*Question.*—" What was the substance of the conversation referred to ?"

To which question the complainant objected.

*Answer.*—" There was a good deal of conversation, considerable talking, and it was said by some of the parties that there was a mistake in the deed, and the mistake was, it should be

Frederick Diener, jr., instead of Frederick Diener; this was said in presence of complainant by Captain George or Mr. Bade, I don't know which; after Mr. Bade left I assisted in an appraisal of the personal property; I drew a bill of sale of said property from Martin to Dieners; I also drew a lease from Dieners to Martin; I am shown exhibit, marked F; the body of said instrument is in my handwriting, all of it except the signatures; I was present when it was signed; I cannot swear that I saw it signed; I know the handwriting of John Martin; the first signature is in his handwriting; at the time it was signed, Mrs. Martin, John Martin, Frederick, jr., complainant, myself and Captain George, were there; it is my best impression that I saw them both sign it, but yet I will not so swear—I mean by both, Frederick Diener, complainant, and Frederick Diener, jr., defendant.

*Question—By defendant's counsel.*—" To whom was the bill of sale of personal property, of which you have spoken, executed, and by whom ?"

To which complainant's counsel objects.

*Answer.*—"It was by John Martin, to Frederick Diener, jr., and Charles Diener. I had a conversation with complainant, through Captain George, as interpreter or agent; it was about the same time of the execution of the bill of sale."

Complainant objects to showing what the conversation was.

*Answer.*—" Captain George was conversing with Mr. Diener, complainant, a short distance from me; after conversing a few moments, Captain George came to me and asked me how that deed could be altered; I told him that he would have to send some person to the register's office, and get the deed and bring it down, and have the alteration made as desired, with the consent of the parties to it, re-acknowledged, and send it back again. I told him I would go and see John Martin, and see if he would consent to it; I went and saw John Martin, and he said he didn't care how many deeds he executed—he had already executed two, and would another if parties wanted it. Captain George asked me how much I would charge to do the business; I told him $10, and he then spoke to Mr. Diener, and said that Diener said he would not give it, but would give $5. This

ended the negotiation. Mr. Martin was sick abed; we were out of doors; I cannot say that I understood from Mr. Diener anything that he said; complainant seemed very much interested and animated in regard to the matter. All these transactions, of which I have spoken, in which I took any part, occurred on the same day that the sale of the land was consummated, or on the day following, or both."

*Cross-examination.*—"Frederick Diener, jr., went to Captain George's to live after he left complainant; I am a lawyer by profession; I was dictated by Captain George in reference to names which I should insert in the papers which I drew; there was but one conversation in which I was named as being the one to alter the deed; I think, at time of said conversation, I stood in the street, out of the door yard; Mr. Diener, complainant, is a German; he could not speak or read the English language; I think I never have had a conversation with Frederick Diener, jr., through an interpreter or otherwise, in relation to these matters; I never agreed to go to Elkhorn to alter the deed."

*Direct resumed.*—"Captain George dictated the names to be inserted in the instruments I drew, in presence of complainant. Complainant was in the same room, out and in, while I was drawing them. Captain George pretended to explain to complainant the substance of the instruments drawn by me, and he appeared satisfied with them. Captain George spoke and read the English language with fluency. The value of the personal property sold at that time, I should think, was about one thousand dollars ($1,000). Complainant paid for it.

Frederick Keuper, recalled, says:—

*Question.*—"State whether or not you and the complainant had a conversation with Albert Bade, the person who has been a witness in reference to the circumstances connected with the conveyance of the Diener farm to complainant by Martin?"

Objected to by defendant's counsel.

*Answer.*—"We had a conversation in Milwaukee, before the commencement of this suit a short time. Complainant and I went to the office of Powers & Schley, I think, to inquire of Mr.

Bade what the facts were in reference to the deed for the Diener farm."

Defendant objects to proof of any conversation with Mr. Bade at this time.

"Mr. Diener told Bade that Frederick Diener, jr., intended to claim half of the farm. Mr. Bade seemed very much surprised that he should claim half of the farm. Diener asked him (Bade) how he understood the deed was made. He (Bade) then told us (myself and Diener) the deed is executed in your (Diener's) name, and your minor son, Carl, in Germany. He (Bade) said that that was the way it was understood, and that was the way he had executed the deed; that Frederick Diener, jr., had nothing to do with the farm whatever. The letter now shown to me, dated March 6th, 1852, purporting to be signed by A. Bade, was written by said Bade, and presented to us to be handed to Mr. Barnes. He (Bade) read the letter to us before he delivered it to us." Complainant now offers said letter in evidence; it is marked exhibit G.

Defendant's counsel objects to the introduction of the letter in evidence. The letter is as follows:

"*Milwaukee, March* 6, 1852.

" *C. D. Barnes, Esq., Burlington.—Dear Sir :* I take the liberty of addressing you a few lines, according to the wishes of Mr. Frederick Diener, of Gardner's Prairie. Mr. Frederick Diener called at my office last year inquiring for farms, and I went several times with him in the country to look after some; at last he did made a bargain with Judge Martin, and *he* bought the place. By influence of his son, he wanted me to made the deed in the name of his sons, Frederick Diener, jr., and Carl Diener, because he was unacqnainted with our laws, and had the idea that he was to have possession of the farm during his natural life. I, as his agent and adviser, did not do so, for the simple reason that he did not understand where he was about, and I wrote the *deed in his name*, the old man, and that of his minor son, Carl, in Germany.

He always did show a great deal of affection for his minor son,

Carl, and told me about him, and wanted me to draw the deed in his name also. The deed was executed on the place, and Mr. Diener and Judge Martin went with me to Elkhorn to have the deed recorded and pay over the money. The money was paid over to me by Frederick Diener, the father, and *not* by the son, in the recorder's office, in presence of the sheriff, recorder, &c., and I did hand the money to Judge Martin for Frederick Diener, in presence of Mr. Cowdry, I believe, the county clerk.

" Any informations more wanted from me on the subject I shall be glad to give.

" Yours respectfully,        A. BADE."

*Cross-examination.*—"In stating what Mr. Bade said, I have given his own words in English; he spoke them in German. I went to see Mr. Bade by request of Mr. Barnes and Mr. Diener. I have aided Mr. Diener, as a friend, in this suit."

*Question.*—"Have you spent considerable time in aiding Mr. Diener in the prosecution of this suit?"

*Answer.*—"I have spent considerable time, by his request, as an interpreter. I don't know that I have been active in procuring testimony for Mr. Diener, except by the request of his counsel. He handed me a paper to hand to Mr. Diener and the deputy sheriff, to subpœna some witnesses. I went to Milwaukee for the purpose of seeing Mr. Bade about the execution of the deed. Mr. Diener said he would pay me for my time in so doing, as an interpreter. Mr. Diener did not need an interpreter to talk with Mr. Bade. I knew when I went to Milwaukee that there was to be a suit about this property. Complainant has told me that he bought the farm for his two sons, and they were to have it after he was dead."

Albert G. Cole, called by complainant.—"Mr. Bade stated to me, in substance, that Mr. Diener's intention was to so arrange that he could control the farm while he lived, and that it should go to his children after his death; this was stated to me by Bade, in a carriage, while with him on the road to Vienna; we were then talking of the Diener farm."

The above testimony of Mr. Cole objected to by defendants.

*Cross-examination.*—" I had previously heard something about there being a mistake in the deed, and he stated to me that the old man, Diener, thought that the property could be entailed upon his sons, by drawing a deed in his name, and so conditioned, that after his death it should go to his sons alone ; but he (Bade) said he had advised the old man to the contrary, and therefore it was drawn in the manner it was. The old man did not want his present wife to have any of the property (Bade said). I had not previously heard of any other mistake in the deed than the one I have heretofore stated in my testimony, that I know of."

The defendants also produced the deposition of David George, who testified as follows : " I am a dealer in fruits, cigars, &c. ; am forty-eight years of age ; reside in the city and county of San Francisco, and state of California; was born and educated in Berlin, Prussia ; German is my native tongue, but I speak fluently the English and French languages ; I know complainant and defendants in this cause; have known them from three to four years ; have known the defendant Wall, from eight to ten years; I first became acquainted with the complainant on the farm where I lived, in Walworth county ; he was introduced to me by one Bade; the defendant Frederick Diener, is the son of the complainant ; I know John Martin ; have known him about five years ; I know of negotiations between complainant and John Martin, in the fall of 1851, about the sale of Martin's farm, in Spring Prairie, and the circumstances came to my knowledge as follows : In the fall of 1851, I was sent for by the complainant and John Martin to come to Martin's house to witness some negotiations concerning the sale of said farm ; I went as requested ; found Mr. Martin in bed, he being unwell at the time ; the complainant was there, and also Mr. Bade ; there was considerable talk between Mr. Diener (the complainant) and Mr. Martin about the said farm, which resulted in Mr. Diener (the complainant) agreeing to pay the money for said farm the next morning, when the deed was to be delivered ; the complainant, to bind the bargain, paid some money down ; I believe about $200 ; Mr. Martin, the complainant and Mr. Bade desired me to

be present the next morning to witness the signing of the deed, payment of money, &c., for the farm; I do not remember the price agreed upon; I took part in the negotiations for the sale of said farm at the request of the complainant and Mr. Martin; I acted in the capacity of interpreter and witness; at the time of the negotiations, I resided on a farm distant about half a mile from John Martin's farm at Spring Prairie, Walworth county; the result of the negotiations was, that a sale was made by John Martin, of the said farm, to Frederick Diener (the complainant), for his sons, Frederick Diener and Charles Diener, and a conveyance was executed by the said John Martin to the said Frederick and Charles Diener, the sons of the complainant; at the execution of the deed, John Martin was present, John Martin's wife, the complainant and the defendant, Frederick Diener, jr., Mr. Cole, Mr. Bade, myself, and I believe the wife of the complainant; I cannot say who drew the deed, as it was made before I came; I think Mr. Bade drew it; the sale was completed and the deed executed in John Martin's house, situated on the said farm; I cannot say of my own knowledge, positively, whether or not there was more than one deed drawn; the complainant told me that a deed had been drawn in Milwaukee, in which his name alone appeared as grantee, and he wished to have a new one drawn, and had had a new one drawn, in order to have the names of the sons, Frederick Diener and Charles Diener, substituted for his own; the land was situate in Spring Prairie, Walworth county, about a quarter of a mile from Vienna, and to the best of my recollection, consisted of about one hundred and thirty or one hundred and forty acres of good farming land; there was upon it a dwelling-house, barn and stable; one of the grantees in the last deed was Frederick Diener, and he was the son of the complainant and is the defendant, Frederick Diener, jr., to his suit; I know the Frederick Diener, mentioned as one of the grantees in the last deed was the son of the complainant, because the complainant told me so; the Frederick Diener, mentioned in the last deed as one of the grantees, was intended at the time of the execution of the deed, for the defendant in this suit; in every allusion to the grantees in the deed by the complain-

ant, in my hearing, he stated that he meant and intended the deed to be drawn in the names of his two sons, Frederick Diener (the defendant) and Charles Diener; I had a conversation with complainant respecting the sale and the deed; it was about two days after the deed had been executed; the complainant asked me whether, in my opinion, it would not be better to have junior affixed to the Frederick Diener mentioned in the last deed as one of the grantees; he thought the junior would better designate the defendant, Frederick Diener; he wished me to ask Mr. Cole how much he would ask to alter the deed; I asked Mr. Cole, in the presence of the complainant, what he would take to alter the deed; Mr. Cole said it was worth $10; the complainant thought that sum too much, and offered Mr. Cole $5, but Mr. Cole would not take less than $10; the complainant then said: 'It will make no difference, as every one knows the farm was bought for my sons, Frederick and Charles;' I know Albert G. Cole; Albert G. Cole acted in behalf of Mr. Martin and took part in the sale of the farm, Mr. Martin being unwell; Mr. Bade acted also on behalf of Mr. Martin and interpreted.

"The only conversations in which I acted as interpreter, was concerning the sale of the personal property. Mr. Bade acted as interpreter for the sale of the farm; I don't recollect the words of the conversation between Mr. Cole and the complainant when Mr. Bade interpreted; it was concerning the sale of the farm; the conversation was in Martin's house; I do know of a sale of personal property, stock, &c., of the said Martin, situated on the farm; Mr. Martin sold it to the defendant, Frederick Diener, jr., and to Charles Diener, sons of the complainant; the sale took place in the same house where the deed of the farm was executed, about one or two days after the execution of the deed, the same parties being present, with the exception of Mr. Bade; Mr. Cole made out the bill of sale of the personal property, and interpreted for Diener, complainant; I acted as interpreter for Mr Diener in the sale of the personal property, and as the general interpreter, Mr. Bade having gone away; I acted at the request of Mr. Martin and the complainant; about five months after, the complainant told me he had had trouble with

his wife, and he would like to know how he could get the farm into his own name, and asked me to speak to Frederick Diener, the defendant in this suit, and I spoke to Frederick Diener, the defendant, who said if his father paid him back what he had paid for it, he might have it, and he would deed it back; I told him perhaps complainant had not the money; he then replied, 'I will let him stay on my share of the farm, free of rent, so long as he lives;' Carl Diener, I believe, was at the time of the sale of the farm in the old country, but the complainant said he expected him every day.

"Upon reflection, I remember a conversation had with Mr. Diener, the complainant, on our way to Martin's house, in a carriage, where he was taking me to be a witness to the negotiations and to the execution of the deed relating to the farm; about twenty rods from Martin's house, he (complainant) asked me to get out as he wished to have a private conversation with me about the farm of Martin's; Bade drove on; the complainant then said, 'Friend George, if you should hear the deed read, don't be astonished, as the farm is bought for my sons, Frederick and Charles; I don't want my wife to hear it, and I wish you would tell Mr. Cole the same, that my wife may not hear it read.' I then told the complainant that he must recollect his wife; he replied, laughingly, that he had enough money left for her; I then hurried him to go to Martin's house, as the party were probably waiting for him to execute the deed. I never saw the deed before it was executed. These are the only material facts in the case which I recollect."

Deeds were also produced in evidence to the court, as follows: A deed of warranty from Frederick Diener, jr., to Charles Schley and Caleb Wall, dated October 1, 1852, conveying, for the consideration of $1, the undivided half of the premises described in the pleadings.

Also a quit-claim deed from Caleb Wall and wife to Charles Schley of all his interest in the same premises, dated November 3, 1852.

The feigned issue came on for trial at the May term, 1856, upon evidence, the material portions of which are before stated,

except a large mass of testimony of an impeaching character and object, all of which is omitted, except such parts as are essential to the appreciation of the exceptions taken in that behalf; whereupon the jury returned the following verdict:

" The jury find that the legal title to the premises described in the deed from John Martin and wife to Frederick Diener and Carl Diener, mentioned in the feigned issue in this cause, was, on the 14th day of September, A. D. 1852, in the complainant in the equity suit mentioned in the said issue, and the said Carl Diener, and was then and there had and held by them."

The defendant thereupon moved the court to set aside the verdict and for a new trial upon the feigned issue, for the reasons and upon the records and papers mentioned in the following stipulation and exceptions.

*Title of the Cause.—Feigned Issue.*—" It is hereby stipulated that the following annexed alleged exceptions taken on the trial to the charge of the court made therein, as amended by the plaintiff's counsel, when settled by the court may be signed and sealed and filed as the basis of a motion for a new trial, as a part of the case on which to make such motion, and that said motion may be made upon such exceptions and the evidence on file and the minutes of the judge, at the earliest opportunity when the same may be heard, without further notice or proceeding—without prejudice to a bill of exceptions on the whole case, if said motion be denied." (Signed.)

*Dated May* 22, 1856.

The following are the exceptions referred to:

1. " The said circuit judge then and there charged the jury that a deed of conveyance was not an agreement in such a sense as required that the minds of the grantor and grantee should meet. That it was rather the consummation or execution of an agreement, and that upon that subject he could not instruct the jury as contended for by the defendant's counsel upon the trial, that the intention of the grantors was a material inquiry for the jury upon this issue.

" To which the defendant's counsel then and there excepted.

2. "And the said circuit judge did then and there charge the jury, that the intention of the grantors, as to whether Frederick Diener, the elder, or Frederick Diener, jr., was the person named, or intended to be named in the deed, was not material to their inquiry, but that the jury should only inquire as to the intention of the party making the purchase and paying the consideration.

"To which said ruling and opinion the defendant's counsel then and there excepted.

3. "The said circuit judge did also then and there charge the said jury, that the declarations made in the presence of Martin and his wife, the grantors, by Bade, as to the reason why the first deed to Frederick Diener was destroyed, and that the deed was to be executed to Frederick Diener and Carl Diener, the sons of Frederick Diener, sr., were not to be considered by the jury, and were no part of the *res gestæ*, if made when the complainant was not present, unless accompanied by proof, that the interpreter correctly interpreted the language of the complainant to them.

"To which the defendants excepted.

4. "Also that an interpreter is not necessarily an agent of the party, so that what is said by him may be given in evidence against the party himself, if he has no knowledge of the language in which the declarations of the interpreter are made, unless accompanied by proof that the interpreter correctly interpreted the language of the complainant to them.

"To which defendants excepted.

5. "The said Circuit Court judge, also, then and there charged the jury that if they believed that Frederick Diener, jr., and the interpreter deceived and imposed upon Frederick Diener, sr., and procured the deed to be executed to Frederick Diener, jr., and Carl Diener, his brother, by the grantor, while Frederick Diener, sr., who made the negotiations for the land and paid the purchase money, supposed and believed it was executed to himself, they should find the issue for the plaintiff.

"To which the defendant's counsel then and there excepted.

"Signed and sealed this May 22, 1856."

. Thereupon the defendants moved for a new trial as follows:

· "And now come the said defendants, by Watkins & Stark, their solicitors, and move this court, upon the records and papers on file therein; and upon the feigned issue and the finding of the jury therein, and upon the testimony on file and the minutes of the testimony taken by the judge on the trial of the said feigned issue, and upon the exceptions alleged and taken on said trial to the admission of testimony as made in the minutes of said judge, and upon the exceptions to the rulings and instructions of the said judge, in his charge to the jury on said trial; as stipulated, settled, signed and sealed, and filed therein, for a rule or order that the verdict of the jury upon the feigned issue be set aside, and that a new trial, or a further trial upon the said feigned issue, be had, because:

" 1st. Of the misdirection of the jury by the said judge, upon the trial of said feigned issue. ·

" 2d. Of the erroneous rulings of the said judge, in excluding and admitting testimony on said trial, and

" 3d. Because the verdict of the said jury is clearly against the weight of testimony."·

· The following is the copy of the minutes of the judge on the trial of the feigned issue, referred to in the motion and stipulations above recited.

*Title of the cause.—Feigned. issue, &c.—*Complainant offered in evidence, by parol, the contents of a letter written by defendant to his mother in Germany—the mother being the divorced wife of complainant; objected to by defendant. Admitted—read in evidence.

: The complainant then moved to suppress the testimony of David George taken on commission issued to California, on the ground that it was not issued in conformity to the provisions of rule 59 of the Circuit Court. No affidavit having been filed and served as required by that rule. But it appearing that the commission was issued in conformity with the provisions of rule 61, in equity, the motion to suppress was denied, and the testimony. read to the jury by the defendant.

Philomela Martin, defendant, testified as follows: "I am the wife of John Martin, and reside in Spring Prairie, in Walworth county; resided there in October, 1851."

The deed to premises in question being shown to witness, she testified as follows: "I recollect my husband and myself executed this deed; it was executed in the west room of our house. Mr. Martin was sick at the time. Captain George and Mr. Bade, and complainant and defendant were present. Bade took the first deed, after it was executed, out of the room, and in a short time brought it back; it was then torn up and put in the stove, and another deed was then executed; the second deed was executed to Frederick Diener, jr.; the reason why I know so, is that Bade, when he came back with the first deed, said it was not satisfactory, and Diener wanted a new deed executed to his son, the defendant; the old man was not present at this conversation about executing the second deed; I did not understand anything the old man said; he did not speak a word of English."

John Martin testified substantially like his wife.

The testimony taken in the case was here read to the jury.

Complainant offered in evidence the letter of Bade to Barnes & Lyon, marked exhibit G, which was ruled out; to which complainant excepted.

[*Venue, &c.*] "I hereby certify that the foregoing is a true copy of my minutes of the testimony, and my rulings thereon, as kept by me on the trial of the feigned issue, in the case of *Frederick Diener vs. Frederick Diener, jr., et al.*, in the Circuit Court for Walworth county, at the last May term of said court.

"J. M. KEEP, *Circuit Judge.*

On the 28th day of May, 1856, a final decree was signed and entered in the cause in the following words:

[*Title of the cause.— Venue of term.*] This cause came on to be heard at this term, and was argued by counsel, and the said complainant having substantiated his title to the lands described in the original and supplemental bills of the said complainant, filed in this cause, and hereinafter described; and it appearing

that the possession of, and the legal title to said lands was, at the commencement of this suit, and ever since has been, in the said complainant, and that the said defendants have set up a claim thereto ; thereupon, upon consideration thereof, it was ordered, adjudged and decreed, and this court, by virtue of the power therein vested, doth hereby order, adjudge and decree, that the said defendants, and each of them, release to the said complainant all claim to an undivided one-half of all those certain pieces or parcels of land, lying and being situated in the county of Walworth and state of Wisconsin, known and described as follows: The southwest quarter of section No. twenty-four (24), in township No. three (3), north of range No. eighteen (18) east, containing one hundred and sixty acres of land, be the same more or less; also that part of the northwest quarter of said section No. twenty-four (24), bounded as follows, to wit : Commencing at the quarter-section post, between sections No. twenty-three and twenty-four (23 and 24), running thence north sixteen chains and twenty-four links (16 chains 24 links), thence east across the northwest quarter of said section No. twenty-four (24), thence south sixteen (16) chains and twenty-four (24) links, to the centre of said section No. twenty-four (24), and thence west to the place of beginning, containing sixty-four and 96-100 acres of land, more or less. And it is further ordered, adjudged and decreed, that the said defendants pay to the said complainant his costs of this suit to be taxed, and that the said complainant have execution therefor.

By the court. *Dated May* 28, 1856.

July 19, 1855, the defendant Charles Schley, filed his bond for the costs on appeal in the penalty of two hundred dollars, pursuant to order of the court, and gave the clerk notice of his appeal from the said final decree to the Supreme Court.

Novemb. r 21, 1856, the parties, by their counsel, signed the following stipulation :

[*Title of the cause.*] A motion having been made by the counsel for the defendants in this cause, before the decree was signed therein, for an order setting aside the verdict of the jury upon

the feigned issue in the cause, and granting a new trial thereon, and it appearing that no order has ever been made or entered deciding said motion, so far as appears by the record of said cause, it is therefore stipulated and agreed that an order determining said motion may be signed by the judge and entered in said cause, all and every objection or objections to the time and manner of entering the same being hereby waived. (Signed.)

Thereupon the following order was made by the court, and entered November 29, 1856 :

[*Title of the cause.*]  " At a term of said court, held at the court-house, in said county, May 28, 1856, present, Hon. J. M. Keep, Judge : On reading the motion of defendants for an order setting aside the verdict of the jury, and granting a new trial upon the feigned issue in this cause, and on examining the case, upon which said motion was founded, and hearing the parties, by their respective counsel, it is ordered that said motion be, and the same is hereby overruled and denied.

" And it is further ordered that the amount of bail upon appeal from this order be, and the same is hereby fixed at two hundred dollars.

" By the court."

From this order the defendants appealed.

*Lyon & Barnes*, for the complainant and appellee, contended that the verdict of the jury upon the issue submitted to them is conclusive as to the fact found by them, unless a new trial be ordered. *Griffith vs. Griffith*, 9 *Paige*, 315.

The only cases in which a court has made a final decree against the party in whose favor the issue has been found, are those where the issue does not answer the purpose for which it was intended ; that is, where the issue does not present the real questions involved in the case. *Armstrong vs. Armstrong*, 3 *My. & Keen*, 45. Therefore, the final decree in this case being in accordance with the verdict, must stand, unless a new trial be ordered, because the issue does present the real question involved, and the verdict is responsive to the issue.

A new trial was properly denied.

1st. Because the court did not misdirect the jury on the trial of said issue. It is to be borne in mind, that the charge of the court was given *with reference to this particular case*, and was not intended as a statement of abstract principles of law; or, in other words, the court simply stated to the jury the principles which would govern him, and the considerations which would influence his mind, were he deciding the case without the intervention of a jury. *Apthorp vs. Comstock*, 2 *Paige Ch. R.* 482.

The appellee having purchased the farm, and paid the consideration therefor, the deed thereof being delivered to him, and he immediately taking possession of the farm; and the grantor, Mr. Martin, being at the time entirely indifferent, as to whom he conveyed the farm, it certainly was entirely immaterial, whether Martin thought he was conveying to the father or son.

The above proposition being correct, it follows, that it was only material to "inquire as to the intention of the party making the purchase, and paying the consideration."

Those portions of the charge referred to in the 3d and 4th exceptions, are correct as abstract principles of law, and *a fortiori* are correct as applied to this case. 1*st Phillipps on Evidence*, 385–6.

The statement made by Bade to Martin and wife, was made in the absence of complainant, and does not purport to be an interpretation of what complainant said.

The portion of the charge embraced in the 5th exception must be considered with reference to the fact, that father and son were of the same name, and the deed contained nothing to designate which of the two was intended to be named therein; and surely, upon every principle of justice and equity, if complainant, who purchased and paid for the farm, believed and intended that the "Frederick Diener," named in the deed, was himself, the issue ought to have been found in his favor; and this, notwithstanding, the grantor might have been led to believe, that the son, and not the father, was intended.

*J. Stark* and *C. K. Watkins*, for the appellant, made the following points:

1. The motion for new trial of a feigned issue is properly addressed to the equity side of the court, and the order of the court denying such motion is a proper subject of appeal. 1 *Barb. Ch. Pr.* 455; 2 *Sim. R.* 319; 2 *Dan. Ch. Pr.* 756.

2. This appeal brought " within fifteen days from the time of entering " the order appealed from.

All objections to the time of entering the order were waived by stipulation.

3. The court below should have set aside the verdict of the jury, and granted a new trial of the feigned issue, for the following among other reasons:

1st. For the error of the court in instructing the jury, that upon the issue, the intention of the grantors, as to the person named as grantee in the deed, was not material to their inquiry, and that they should only inquire as to the intention of the party making the purchase, and paying the consideration.

The intention of the grantors is the necessary subject of inquiry upon such an issue as this. There are two persons bearing the name of the grantee in the deed. It is to be determined which of the two was *intended* as grantee. Whose intention is material? that of the grantor, whose deed it is, or of the pretended grantee, whose right is in dispute?

The cases which allow the right to introduce extrinsic evidence, in cases of latent ambiguity, say it is to explain the *intent of the party;* what party is meant, unless it be the party executing the deed, speaking through it?

Latent ambiguity in the description of property, is explained in no other way. The sole inquiry is, what did the grantor intend by *his deed?*

In construing all grants and devises, the rule is uniform to ascertain from the terms employed, what the grantor or devisor intended by the instrument. By what principle is the inquiry changed when it is found that the instrument is ambiguous? Is it less important to know what the maker intended, because his intention is not apparent from the terms of his deed?

Diener vs. Diener.

The grantee, by refusing to accept a deed, can defeat its operation ; but if he accepts it, he accepts it *as made by the grantor*, and courts must construe the deed as expressing the intention of the grantor. It is *his* written indenture, *his* act ; he fixes all its terms, names his grantee, describes the property, subject of the deed, his will is expressed in it, and cannot be defeated by his grantee after acceptance of the deed.

As to the various questions upon this point, see 2 *Cow. and Hill's Notes*, pp. 539 *and* 540, *and cased there cited* ; *Coit vs. Starkweather* (8 *Conn. R.* 289); *Jones vs. Newman* (1 *Blackf.* 60); *Jackson vs. Schultze* (13 *Johnson*, 518) ; *Wigram on Extr. Evi.* 118.

2d. For error in excluding from the jury the declaration of Bade, in presence of Martin and wife, as to reasons for destroying the first deed and executing another to the sons.

This error arises. from the assumption that the intent of the complainant was alone material to the issue, and that this testimony was offered to show *his* intent.

The evidence is, however, material and proper, as showing the intent of the grantors, which is to be gathered from their own statements, strengthened by circumstances attending the execution of the deed.

It is admitted, or at least shown without contradiction, that Bade and George acted as interpreters and agents for the complainant—spoke for him and represented him in the conversations and negotiations at and about the time of the execution of the deed. The grantor, Martin, could not converse with the complainant without the interpreter. Whatever these interpreters, therefore, said, relating to the subject of the negotiations pending, for and in behalf of the complainant, he would clearly be bound by, at least after the grantor had acted upon their statements; were this not so, there would be no safety in the dealings between persons speaking different languages.

The testimony was also material and proper, as showing that the complainant requested the grantor to execute the deed to the defendant, thus rebutting any presumption that might be claimed in favor of the complainant from payment of the purchase money or otherwise.

3d. The judge, in his charge, stated in defendant's fifth exception, has entirely misconceived the nature of the issue to be tried by the jury. The simple question for the jury to determine was, "whether the legal title in the lands, &c.," "was, on the 14th day of September, A. D. 1852, in the said complainant and the said Carl Diener, and was then had and held by them." This excludes from the jury any considerations of fraud on the part of the interpreter or Frederick, jr., or any other person.

There is to be tried the simple question of fact:—was the grantee, Frederick, sr., or Frederick, jr.? and that fact will remain the same, whether brought about by fraud or not. If Frederick Diener, jr., bribed the interpreter, and the old man was deceived and imposed upon, and the result of this was, that the deed was in fact executed to Frederick, jr., and not to Frederick, sr., it follows most clearly that Frederick, jr., held the legal title. Had the son borne any other name, would the judge have made this charge? Yet his language is equally applicable to such a case. He instructs the jury, in other words, that if they find that the deed was in fact executed to Frederick, jr., and Carl, his brother, by the grantor, yet if they believe Frederick, jr., and the interpreter procured this to be done by deceiving and imposing on the old man, and he believed and supposed it was executed to him, then the jury (having found that the deed was in fact executed to Frederick, jr.) shall declare that the legal title is in the old man. Or, briefly, if they find that the deed was executed to Frederick, jr., they may still find the legal title to be in Frederick Diener, sr.

Legal title without a conveyance! The similarity of names can make no difference.

Had the conveyance been made to Thomas Diener under like circumstances, under the charge, the legal title might still have passed to and vested in the father. How? Is the deed void for fraud? If void, then no title has passed from Martin. But Martin does not complain of fraud; the deed is good as to him; his title has passed. To whom? To his *grantee named* in his deed of conveyance, or to some one not named, who paid the consideration and *supposed* the deed was made to himself?

Courts of chancery will interpose to prevent fraud, and to relieve from its consequences, on complaint of the party affected by it, but fraud must be alleged, must be charged as the ground of relief, and must then be proved, or courts will not interfere with the legal title.

The complainant in this cause has, however, not pretended that there was fraud. He rests his whole claim for relief upon his own legal title, as the grantee of John Martin, named in his deed, and refers to the claim of the defendant Frederick, jr., as false and unfounded in fact. To sustain the bill, therefore, complainant must prove that the deed was, in fact, executed to himself and not to Frederick, jr. The feigned issue is no broader. If the jury then found that the deed was executed to Frederick, sr., it was their duty to find for the complainant. If they were satisfied it was executed to Frederick, jr., they should have found a verdict for the defendants on the issue, regardless of questions of fraud, which were improperly submitted to them; and the instruction of the judge that they might find for the complainant, though they believed the deed was executed to Frederick, jr., is most obviously erroneous.

Fraud does not change the facts. Had Frederick, sr., given his son the money, and instructed him to purchase the farm for him (Frederick, sr.), and the son had purchased the farm with his father's money, and taken the deed in his own name, the fraud upon the father would be quite as great as supposed by the judge; yet the father would not think of applying to this court to decree that the legal title was in himself. His complaint would be that his son had taken title to himself in fraud of the father's rights, and his prayer for relief would ask that the son's title might be decreed to be held in trust for the father, and that the son might be decreed to convey to the father, &c. In order to obtain relief on the ground of fraud, a party must admit the fact in respect of which the fraud was committed, otherwise there is no fraud, no ground of complaint.

In this cause fraud plays no part; it is not alleged, and the allegations upon which the relief of the court is asked, preclude the possibility of its existence.

If complainant had stated in his bill, in the language of the judge in his charge, "that Frederick Diener, jr., and the interpreter deceived and imposed upon " him, " and procured the deed to be executed to Frederick Diener, jr., and Carl Diener, his brother, by the grantor, while " he, the complainant, " who made the negotiations for the land, and paid the purchase money, supposed and believed it was executed to himself," he might have presented a case for relief ·on account of fraud. But he has presented no such issue, and all the testimony bearing upon it was irrelevant, as the charge was erroneous.

Whether there was fraud or not on the part of Frederick, jr., and the interpreter, or either of them, was wholly immaterial, and the court should have so instructed the jury. ·

It must not be forgotten that sec. 7, chap. 57, of the Revised Statutes, declares that where a grant for a valuable consideration is made to one person, and the consideration is paid by another, no use or trust shall result in favor of the person who paid the consideration, but *the title shall vest* in the person *named as the alienee in such conveyance.*

The verdict, under the instructions of the court, was based upon a question of fraud not put in issue by the pleadings. A decree founded upon the verdict would therefore violate the principle, that " a decree must be sustained by the *allegations of the parties,* as well as by the proofs in the cause, and *cannot be founded on a fact not put in issue by the pleadings.*" *Carneal vs. Banks,* 10 *Wheaton,* 181

*By the Court,* WHITON, C. J. The bill in this case was filed for the purpose of compelling Frederick Diener, jr., one of the defendants, to execute a release to the complainant of certain lands described in the bill.

The bill charges that the complainant purchased a quantity of land of one John Martin, and took a conveyance of the same to himself and his son Carl Diener jointly; that his other son, Frederick Diener, jr., sets up a claim to one-half of the land,

claiming to be one of the grantees named in the conveyance of the land from Martin. The bill prays that Frederick, jr., may be decreed to release to the complainant all his right to the land, and for general relief.

The answer of Frederick, jr., claims that the purchase of the land was made by Frederick, sr., for his sons Carl and Frederick, jr., and that they are the grantees named in the deed. The answers of the other defendants need not be noticed.

It will be seen that the principal question is, whether the real grantee named in the deed from Martin, with Carl, was Frederick the father or the son. To determine this question a feigned issue was awarded, and a jury called, who, after hearing the testimony, found that the title was in Frederick, sr., the complainant.

A motion was made to set aside the verdict of the jury, and to grant a new trial of the feigned issue, which was denied by the court. From the order denying this motion, this appeal is taken.

The principal matters relied upon by the appellant to reverse this order are, the alleged errors of the judge before whom the issue was tried, in permitting improper testimony, and in the instructions which he gave to the jury. It appears that Charles Diener was allowed to testify to the fact that he had seen a letter from the defendant Frederick Diener, jr., written to his mother in Germany, and was allowed to state its contents, against the objections of the defendants.

We think this testimony ought not to have been received. The letter itself should have been produced, or proof of its loss given, before testimony to prove its contents could be received. The well established principle that the party who seeks to establish a fact, must do so by the best evidence which the nature of the case admits of, prevents the reception of secondary evidence of this nature.

It appears that the judge instructed the jury that the intention of the grantors, as to whether Frederick Diener, the elder, or Frederick Diener, the younger, was the person named or intended to be named in the deed, was not material to the inquiry,

but that the jury should only inquire as to the intention of the party making the purchase and paying the consideration. We think this instruction is wrong, and calculated to mislead the jury.

It is true, that when the grantor receives the consideration for the land which he conveys, he is usually indifferent who the grantee is, and is controlled upon that subject by the will of the person with whom he negotiates the sale, and from whom he receives the purchase money. But this may not always be the case. A grantor may refuse to convey the land to A., and at the same time be very willing to convey it to B. In such a case the will of the grantor would be a very material subject of inquiry. In this case the deed is so drawn, that it is sufficient to pass the title to either the father or the son, and did pass the title to the one who was intended by the parties. If the grantor was entirely indifferent on the subject, and manifested a willingness to convey the land to the person who should be named by Diener the elder, then the will of the latter ought to control; and if he intended that the title should pass to himself, we think it did so pass. But the jury should not have been instructed that the intention of the grantor was not a proper subject of inquiry, unless they were of opinion, from the testimony, that he was willing to be controlled by the will of Diener the elder, who paid the purchase money. We do not feel called upon to decide whose intention should control in case of a mutual mistake between the grantor and the person who pays for the land conveyed. If the grantor intended to convey to one, and the person who paid the money intended that the conveyance should go to another, while, as in this case, the deed should be so drawn as to be adequate to convey the title to either, it may be a matter of doubt to whom the title would really go; and as this question does not necessarily arise, we shall express no opinion upon it.

It was contended at the argument that the testimony showed the grantor to be entirely willing to convey the land to whomsoever Diener, the elder, should name, and that the instructions of the judge were predicated upon the state of facts established

by the testimony. We do not intend to express an opinion upon the testimony. As there must be a new trial, it would be improper to do so, as the expression might tend to mislead the jury.

It appears that the judge charged the jury, that an interpreter was not necessarily an agent of the parties, so that what he said might be given in evidence, if the party sought to be charged by his declarations had no knowledge of the language in which they were made, unless accompanied by proof, that the interpreter correctly interpreted the language of the party.

The above is the substance of the charge of the judge upon the subject, and we think it is correct. There is no doubt that the circumstances may be such as to make the interpreter an agent, so as to bind the parties; but we think he is not *necessarily* an agent. The *mere fact* that a person contracts with another, whose language he does not understand, by means of an interpreter, does not constitute the latter an agent, so as to bind him by a false translation of the language of the parties. It would be most dangerous to hold such to be the law, as such a doctrine would hold out great inducements to persons to commit the grossest fraud upon the unwary and unsuspecting.

We see no other errors in the charge of the judge, to the jury in this case, but on account of those above alluded to, and for the reason that parol evidence was allowed to be given of the contents of the letter of Frederick, jr., one of the defendants, the order appealed from must be reversed.

Order reversed, with costs.